# STATE OF MICHIGAN

# COURT OF APPEALS

MICHEIL HANCZARYK and BRISTOL
CHIROPRACTIC CENTRE,

　　　　　Plaintiffs-Appellees,

v

BOYD E. CHAPIN, JR., and GARAN LUCOW
MILLER, P.C.,

　　　　　Defendants,

and

PODIATRY INSURANCE COMPANY OF
AMERICA, PACO ASSURANCE COMPANY,
INC., and LINDA REEVES,

　　　　　Defendants-Appellants.

UNPUBLISHED
October 28, 2014

No. 313278
Genesee Circuit Court
LC No. 09-091916-NM

Before: STEPHENS, P.J., and TALBOT and BECKERING, JJ.

PER CURIAM.

Defendants, Podiatry Insurance Company of America ("PICA"), PACO Assurance Company, Inc. ("PACO"), and Linda Reeves, appeal as of right from a judgment, following a jury trial, in favor of plaintiff, Micheil Hanczaryk, against all three defendants on his claims for false-light invasion of privacy and negligence, and in favor of plaintiff, Bristol Chiropractic Centre ("Bristol Chiropractic"), against defendants PICA and PACO on its claim for breach of contract. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. FACTS AND PROCEEDINGS

Plaintiffs brought this action to recover damages arising from an underlying professional malpractice action brought by Tracy Boyer, one of Hanczaryk's former patients. Defendants PICA, PACO, and Reeves, a claims specialist (collectively referred to as "defendants"), were responsible for managing the underlying case pursuant to a malpractice liability insurance policy issued to plaintiffs, and defendant Boyd E. Chapin, an attorney with defendant law firm Garan

-1-

Lucow Miller, P.C. ("Garan Lucow"), provided legal representation for plaintiffs in the underlying action. The underlying action was resolved by a settlement in which plaintiffs agreed to pay Boyer $275,000, divided evenly between Hanczaryk and Bristol Chiropractic.

In the underlying action, Boyer alleged that Hanczaryk performed an improper spinal adjustment, causing her to suffer a herniated disc that left her permanently disabled. Chapin was assigned to represent plaintiffs. Pursuant to MCL 600.2912e, plaintiffs—who were the defendants in the underlying medical malpractice action—were required to file an affidavit of meritorious defense in support of their answer to Boyer's underlying complaint. Hanczaryk executed and filed an affidavit of meritorious defense on his own behalf. Chapin also obtained and filed an affidavit from another chiropractor, Dr. Bryan Kostelnik, but Chapin either failed to timely file it, or erroneously represented to the court that it was untimely. Consequently, the trial court entered an order striking Kostelnik's affidavit, but not Hanczaryk's, and prohibiting plaintiffs from presenting independent expert testimony in the underlying action.[1] The trial court's order did not specify that the prohibition on presenting expert testimony applied only to expert testimony on the standard of care. Although plaintiffs assert that they might have been permitted to present expert testimony on the issues of causation and damages, the scope of the order was never raised as an issue in the underlying action.

A principal factual issue in the underlying action was whether Hanczaryk actually performed a spinal adjustment as alleged by Boyer. Although Boyer maintained that Hanczaryk performed a cervical adjustment of her spine, Hanczaryk denied doing so and claimed that he was unable to treat Boyer because she was in so much pain that she could not tolerate being positioned on the treatment tables. Instead, he advised her to go to a hospital emergency room or her primary care physician. Notwithstanding Hanczaryk's claim that he did not perform a spinal adjustment on Boyer, Bristol Chiropractic billed Boyer's insurance carrier, Blue Cross Blue Shield of Michigan, for an adjustment procedure. Plaintiffs maintained that this was a billing mistake, but defendants considered it a serious discrepancy that undermined Hanczaryk's credibility. Defendants believed that the combined loss of expert testimony and the billing discrepancy substantially compromised their ability to defend the underlying action, and that Boyer's young age and permanent disability exposed plaintiffs to a substantial verdict in Boyer's favor, in excess of the $500,000 liability limit in plaintiffs' malpractice policy.

Reeves eventually advised Chapin to put his malpractice insurance carrier on notice of a possible legal malpractice action by plaintiffs. Plaintiffs maintain that the circumstances created a conflict of interest between defendants and plaintiffs, whereby defendants acted to protect Chapin and their own interests to plaintiffs' detriment. According to plaintiffs, defendants neglected to act in plaintiffs' best interests pursuant to their duty to provide the best defense possible by timely substituting different counsel for Chapin and conscientiously preparing for trial, and instead pressured them to consent to a settlement. Ultimately, the case was settled for

---

[1] This Court denied plaintiffs' application for leave to appeal that order in *Boyer v Bristol Chiropractic Centre PC*, unpublished order of the Court of Appeals, entered April 3, 2009 (Docket No. 289108).

$275,000, divided equally between Hanczaryk and Bristol Chiropractic. In accordance with 42 USC 11131(a), defendants reported the settlement to the National Practitioners Databank (NPDB). The content of that report is at issue in this case.

Plaintiffs thereafter brought this action for legal malpractice against Chapin and Garan Lucow and for breach of contract and other torts against defendants. Plaintiffs alleged that defendants breached the insurance contract by failing to provide a defense and by failing to act in good faith. Plaintiffs also asserted claims against defendants for negligence, gross negligence, and false-light invasion of privacy based on the NPDB report. Plaintiffs settled their claims against Chapin and Garan Lucow. Bristol Chiropractic resolved its claims against Chapin and Garan Lucow for $112,500; Hanczaryk settled his claims against Chapin and Garan Lucow for an undisclosed amount. Plaintiffs' claims against defendants proceeded to a jury trial. The jury awarded Bristol Chiropractic $408,218 on its breach of contract claims against PICA and PACO, and awarded Hanczaryk noneconomic damages of $6,579,470 against all three defendants on his claims for false-light invasion of privacy and negligence. After awarding both plaintiffs prejudgment interest, the trial court entered a final judgment awarding Bristol Chiropractic and Hanczaryk $423,099 and $6,889,156, respectively. Defendants' post-judgment motions for judgment notwithstanding the verdict (JNOV), a new trial, setoff, and remittitur were denied.

## II. JURY INSTRUCTIONS

Defendants argue that the trial court erred in instructing the jury on plaintiffs' claim for false-light invasion of privacy and the bad-faith element of plaintiffs' breach of contract claim. Because defendants did not articulate specific objections to either the trial court's verbal instructions on false-light invasion of privacy, or to the written instructions that were provided to the jury, this issue is unpreserved. MCR 2.512(C); *Jimkoski v Shupe*, 282 Mich App 1, 9; 763 NW2d 1 (2008). However, defendants preserved their claim relating to the bad-faith element of the breach of contract claim by presenting their own proposed instruction and placing the contents of that instruction into the record, which the trial court declined to give.

Preserved claims of instructional error are reviewed de novo. *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 8; 651 NW2d 356 (2002). This Court reviews the jury instructions "as a whole to determine whether they adequately present[ed] the theories of the parties and the applicable law." *Alpha Capital Mgt, Inc v Rentenbach*, 287 Mich App 589, 626-627; 792 NW2d 344 (2010). With regard to unpreserved claims of instructional error, "[t]he failure to timely and specifically object precludes appellate review absent manifest injustice." *Heaton v Benton Const Co*, 286 Mich App 528, 537; 780 NW2d 618 (2009). "Manifest injustice results where the defect in instruction is of such magnitude as to constitute plain error, requiring a new trial, or where it pertains to a basic and controlling issue in the case." *Janda v Detroit*, 175 Mich App 120, 126; 437 NW2d 326 (1989).

### A. INSTRUCTIONS ON FALSE-LIGHT INVASION OF PRIVACY

Michigan recognizes the common-law tort of invasion of privacy. *Dalley v Dykema Gossett, PLLC*, 287 Mich App 296, 306; 788 NW2d 679 (2010). Invasion of privacy can be based on any of four distinct tort theories, including "publicity that places someone in a false light in the public eye[.]" *Id.*, quoting *Lewis v LeGrow*, 258 Mich App 175, 193; 670 NW2d 675

-3-

(2003). The tort of false light invasion of privacy "is limited to situations where the plaintiff is given publicity." *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 385; 689 NW2d 145 (2004). The elements of this tort are as follows:

> In order to maintain an action for false-light invasion of privacy, a plaintiff must show that the defendant broadcast to the public in general, or to a large number of people, information that was unreasonable and highly objectionable by attributing to the plaintiff characteristics, conduct, or beliefs that were false and placed the plaintiff in a false position. [*Porter v Royal Oak*, 214 Mich App 478, 486-487; 542 NW2d 905 (1995), quoting *Duran v Detroit News, Inc*, 200 Mich App 622, 631-632; 504 NW2d 715 (1993).]

"[T]he defendant must have known of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed." *Detroit Free Press, Inc, v Oakland Co Sheriff*, 164 Mich App 656, 666; 418 NW2d 124 (1987). "Reckless disregard is not measured by whether a reasonably prudent man would have published or would have investigated before publishing, but by whether the publisher in fact entertained serious doubts concerning the truth of the statements published." *Battaglieri v Mackinac Ctr for Pub Policy¸* 261 Mich App 296, 304; 680 NW2d 915 (2004) (citations and quotation marks omitted).

The trial court gave the following oral instruction regarding false-light invasion of privacy:

> We also have a claim here of false light invasion of privacy. That's a tort. This claim is separate from the contract theory. To prevail on this claim the Plaintiff must prove that the Defendant was negligent and/or grossly negligent. If you decide that the Plaintiff is entitled to damages, it's your duty to determine the amount of money which reasonably, fairly and adequately compensates Plaintiff for each of the elements of damage, which you decide has resulted from the negligence or gross negligent [sic] of the injury.

According to the record, this oral instruction was given in conformity with a written instruction that was given to the jury. That written instruction provided as follows:[2]

> The claim of False Light Invasion of Privacy is a tort. This claim is separate from the contract claim. To prevail on this claim, plaintiff must prove that the Defendant was negligent and/or grossly negligent.
>
> If you decide that the plaintiff is entitled to damages, it is your duty to determine the amount of money . . . .

---

[2] Plaintiffs claim that defendants proffered this instruction to the jury, thereby waiving any claim of error. A review of the transcripts does not support this assertion. The record reveals that defendants admitted proffering the instruction to the trial court in a *post-trial motion* about the instructions, not that defendants proffered the instruction to the jury for deliberation.

These instructions are erroneous because they conflict with the requirement from *Detroit Free Press*, 164 Mich App at 66, that plaintiffs were required to prove that defendants knew that their statement was false, or that they acted in reckless disregard of the statement's truthfulness. Further, neither instruction provided any elements of a false-light claim. However, in addition to these erroneous instructions, the jury received another written instruction in its packet of instructions that correctly listed the appropriate elements and standard for a false-light invasion of privacy claim.[3] That instruction provided:

> The following are the elements of a tort known as false light invasion of privacy:
>
> ➢ Plaintiff must establish that there was a communication broadcast to the public in general or publicized to a large number of people.
>
> ➢ The communication placed the injured party in a light which would be highly offensive to a reasonable person.
>
> ➢ The Defendants must have had knowledge of the false light, or acted in reckless disregard as to the falsity of the publicized matter, and the false light in which the other would be placed.
>
> ➢ In addition, plaintiff may also recover if the Defendants disclosed information concerning the plaintiff, which would be highly offensive to a reasonable person, and which was of no legitimate concern to the public.

The jury instructions in this case clearly conflicted with one another, as two instructions completely omitted the elements of a false-light invasion of privacy claim, and the instructions conflicted regarding the standard that the jury was to use in assessing plaintiffs' claim.[4] Regarding conflicting jury instructions, our courts have explained that "[i]f the court gave conflicting instructions, one of which was erroneous, the jury is presumed to have followed the erroneous instruction." *Bachman v Swan Harbour Ass'n*, 252 Mich App 400, 424; 653 NW2d 415 (2002). See also *Kirby v Larson*, 400 Mich 585, 606-607; 256 NW2d 400 (1977) (citation and quotation omitted) ("Where instructions give to the jury contradictory and conflicting rules for their guidance, which are unexplained, and following either of which would or might lead to different results, then the instructions are inherently defective and erroneous."). Given that the

---

[3] Defendants claim that the trial court did not provide the jury with the written instruction that contained the elements of a false-light invasion of privacy claim. The trial court found otherwise after reviewing a copy of a packet of similar written instructions that were provided to all parties. We find no basis for deeming this finding by the trial court regarding occurrences in its own courtroom clearly erroneous. *Miller-Davis v Ahrens Constr, Inc*, 495 Mich 161, 172-173; 848 NW2d 95 (2014).

[4] In addition, in resolving this issue, we note that plaintiffs' counsel, during closing argument, emphasized to the jury that plaintiffs' false-light claim was "what we call a negligence claim[.]"

instructions conflicted on this crucial point, "[w]e cannot conclude that the instructions as a whole, some correct and some incorrect, clearly apprised the jury of the governing law and protected defendants' rights." *Sudul v Hamtramck*, 221 Mich App 455, 461; 562 NW2d 478 (1997).

We conclude that defendants have demonstrated manifest injustice on their unpreserved claim of error. See *Heaton*, 286 Mich App at 537. As discussed in more detail *infra*, the factual circumstances of the NPDB report do not support a finding that defendants acted intentionally or recklessly when they submitted the report as the information in the report was substantially true. Further, Kathleen Phillips, PACO and PICA's vice president of claims, acknowledged that the individual who submitted the report "misspoke" in listing "adjustment of cervical spine only" under "procedure performed." The jury found that defendants were not "grossly negligent," which indicates that it might have found that defendants acted negligently, but not recklessly, when drafting the NPDB report. These circumstances suggest that the jury's finding on false-light invasion of privacy was based on the wrong standard of liability, and that it would not have found liability under the correct, higher standard. We therefore conclude that this error alone could warrant reversal. See *id.* However, as discussed in detail below, we find that defendants were entitled to a directed verdict and/or JNOV on this claim, and we reverse the verdict with regard to false-light invasion of privacy on those grounds.

## B. INSTRUCTIONS ON BREACH OF DUTY OF GOOD FAITH

Plaintiffs and defendants submitted different proposed instructions addressing the bad-faith element of plaintiffs' breach of contract claim. Defendants' proposed instruction provided:

> When I use the phrase "bad faith" with respect to the defendant's conduct, I mean arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owed a duty. Claims of bad faith cannot be based upon negligence or bad judgment, so long as the actions were made honestly and without concealment. It is inappropriate in reviewing the conduct of the insurer to utilize "20-20 hindsight vision." The conduct under scrutiny must be considered in light of the circumstances existing at the time. Under the terms of the professional liability insurance contract between the Plaintiff and Defendant, the Defendant owed the Plaintiff a duty to act in good faith.
>
> It is for you, the jury, to decide whether or not the Defendant acted in bad faith.

The trial court instead elected to give plaintiffs' proposed instruction, and instructed the jury as follows:

> It's called duty of good faith and fair dealing. Now there's an implied duty of good faith in every insurance policy; and the Plaintiff's claim that these two Defendants, PACA – PACO or PICA, breached this duty by acting in bad faith. So that means they have the burden of proof, to prove that PACO/PICA breached the duty by acting in bad faith. They must prove to you certain things. First, they have to prove that the Plaintiffs were insured under a policy of

insurance issued by Defendant; and the second thing they have to prove to you is that this Defendant failed to . . . deal fairly and acted in bad faith with the Plaintiffs; and the third thing they have to prove is that the Defendant's bad faith caused the Plaintiffs to suffer injury or damage or loss of harm. And where the insurer's and the insured's interests conflict, an insurer cannot protect its own interest to the detriment of its insured's interest, but the insurer must sacrifice its interest in favor of the . . . insured.

Now, if you find that Defendant PICA/PACO's conduct was indifferent or an intentional disregard to the Plaintiff's interest, then the Defendant breached the duty of good faith; and I direct you to find that Defendant, PICA/PACO acted in bad faith.

In *Commercial Union Ins Co v Liberty Mut Ins Co*, 426 Mich 127, 136-137; 393 NW2d 161 (1986), our Supreme Court provided the following discussion of bad faith in the context of bad-faith claim against an insurer:

Contrary to holdings in some other jurisdictions, bad faith should not be used interchangeably with either "negligence" or "fraud." Michigan has reached this conclusion in the past. Accordingly, we define "bad faith" for instructional use in a trial court as arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owed a duty.

Good-faith denials, offers of compromise, or other honest errors of judgment are not sufficient to establish bad faith. Further, claims of bad faith cannot be based upon negligence or bad judgment, so long as the actions were made honestly and without concealment. However, because bad faith is a state of mind, there can be bad faith without actual dishonesty or fraud. If the insurer is motivated by selfish purpose or by a desire to protect its own interests at the expense of its insured's interest, bad faith exists, even though the insurer's actions were not actually dishonest or fraudulent.

Defendants argue that the trial court's bad-faith instruction was incorrect under Michigan law. They argue that the instruction did not explain to the jury that mere negligence, good-faith denials, offers of compromise, or other honest errors of judgment are not sufficient proof of bad faith.

The key phrase in *Commercial Union*, "arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owed a duty," is half-repeated in the trial court's instruction that the jury must find bad faith if it finds that defendants "conduct was indifferent or an intentional disregard to the Plaintiff's interest." The phrase "motivated by selfish purpose or by a desire to protect its own interests at the expense of its insured's interest," as used in *Commercial Union* was incorporated in the trial court's statement, "where the insurer's and the insured's interests conflict, an insurer cannot protect its own interest to the detriment of its insured's interest, but the insurer must sacrifice its interest in favor of the . . . insured." Viewed as a whole, we find that the trial court's instructions adequately presented the applicable law. The court's instruction required the jury to find that defendants prioritized their own interests to

plaintiffs' detriment, or that defendants were indifferent to plaintiffs' interests, or that they *intentionally* disregarded plaintiffs' interests. These requisite findings necessarily precluded the jury from finding that defendants acted in bad faith if defendants were merely negligent, or if their actions were unreasonable only in hindsight.

## C. REMAINING CLAIMS OF INSTRUCTIONAL ERROR

The trial court's instruction on bad faith was followed by the following instruction regarding plaintiffs' breach of contract claim:

> The Plaintiffs have a theory called breach of contract. Plaintiffs and Defendants PICA/PACO Assurance Company, Incorporated, entered into a valid contract providing for professional liability insurance; and the specific terms of the contract of insurance were identified in the insurance policy. The policy of insurance required certain behavior and performance on the part of the Defendants; and, if these Defendants failed to fulfill the terms of that contract as claimed, then you may find that the Defendants breached the contract. The Plaintiff's got the burden of proof here. They have to establish that the contract has been breached first by failure to defend or by breach of the duty of good faith; and, if this Plaintiff has established that there were breaches of contract attributable to these Defendants which caused economic damages, then Plaintiff is entitled to recovery economic damages.

The trial court identified the elements of breach of contract that plaintiffs were required to prove as follows:

> First of all, they have to prove that there was a contract between the Plaintiffs and the Defendants. Second, they have to prove that the Defendant breached the contract. Third, they have to prove that Plaintiff suffered some kind of damages as a result of the breach; and, in this case, by the way, the parties do not dispute there was a contract between them.

The jury verdict form did not include separate findings for both the bad-faith and failure-to-defend breach of contract theories. Defendants argue that the verdict form should not have combined the breach of contract theories.

We find no merit to defendants' unpreserved assertion of error. Plaintiffs asserted two theories for breach of contract—breach of the duty of good faith and failure to defend. Arguably, sufficient evidence supported each of these theories. Defendants' failure to monitor Chapin's compliance with court procedures, their failure to provide co-counsel until early 2009, and their assumption that Boyer's claim was too strong to risk trial could be viewed as a failure to defend, separate from defendants' alleged conspiracy to coerce Hanczaryk's consent, which could support a claim for bad-faith breach of contract. Given that both theories were supported by the evidence, we do not find manifest injustice warranting reversal. See *Heaton*, 286 Mich App at 537.

Defendants also argue that they were entitled to a specific instruction that they were not liable for the conduct of Chapin or Garan Lucow. Defense counsel requested that the trial court

give a "special instruction . . . concerning non-liability for professional negligence of attorney . . . ." advising the jury that defendants "are not responsible for the professional negligence or legal malpractice of the attorney, Boyd Chapin, or his firm." The trial court declined to give the instruction. Defendants argue that plaintiffs exploited this opportunity by repeatedly stating in closing argument that Chapin lied and committed other errors. Plaintiffs accused Chapin of lying in his testimony, for example by denying that he advised Hanczaryk not to correct the billing error, and by stating, contrary to e-mails and correspondence, that he did not believe Hanczaryk had a meritorious defense. Read in context, however, plaintiffs' arguments attacked Chapin's credibility as a witness. These arguments targeted defendants' position that they had legitimate reasons for recommending settlement, and defendants' denial that they concocted reasons for a settlement in order to shield Chapin's incompetence and their own incompetence. The arguments did not explicitly or implicitly urge the jury to regard defendants as vicariously liable for Chapin's malpractice.

## III. DEFENDANTS' MOTIONS FOR DIRECTED VERDICT AND JNOV

Defendants argue that the trial court erred in denying their motions for a directed verdict and/or JNOV on their claims for false-light invasion of privacy and negligence, and on the issue of proximate cause.

The trial court's decision on a motion for a directed verdict is reviewed de novo on appeal. *Aroma Wines & Equip, Inc v Columbian Distribution Servs, Inc*, 303 Mich App 441, 446; 844 NW2d 727 (2013). This Court "must consider the evidence in the light most favorable to the nonmoving party, making all reasonable inferences in the nonmoving party's favor." *Id.* (citation and quotation marks omitted). "A directed verdict is appropriately granted only when no factual questions exist on which reasonable jurors could differ." *Id.* (citation and quotation marks omitted). Similarly, "[t]his Court reviews a trial court's decision on a motion for JNOV de novo." *Livonia Bldg Materials Co v Harrison Constr Co*, 276 Mich App 514, 517; 742 NW2d 140 (2007). This Court "must view the evidence and all legitimate inferences in the light most favorable to the nonmoving party . . . to determine whether a question of fact existed." *Id.* at 517-518. JNOV is appropriately granted only if the evidence at trial failed to establish a claim as a matter of law. *Id.* at 518.

## A. FALSE-LIGHT INVASION OF PRIVACY

Plaintiffs' false-light invasion of privacy claim was based on plaintiffs' contention that defendants falsely reported in the NPDB report that Hanczaryk had performed a cervical adjustment of Boyer's spine. As noted:

> In order to maintain an action for false-light invasion of privacy, a plaintiff must show that the defendant broadcast to the public in general, or to a large number of people, information that was unreasonable and highly objectionable by attributing to the plaintiff characteristics, conduct, or beliefs that were false and placed the plaintiff in a false position. [*Duran*, 200 Mich App at 631-632.]

Plaintiffs' false-light claim was premised on one line contained in the NPDB report entitled "Description of the Procedure Performed" indicating that the procedure was an

"ADJUSTMENT OF CERVICAL SPINE ONLY[.]" They alleged that this line portrayed Hanczaryk as a doctor who committed malpractice by performing an incorrect adjustment that harmed his patient. We agree with defendants that no factual questions exist on which reasonable jurors could differ with regard to whether defendants broadcast false information or information that placed Hanczaryk in a false light.

False-light claims are similar to claims for defamation, and thus are subject to defenses in defamation claims, such as the substantial truth doctrine. *Collins v Detroit Free Press, Inc*, 245 Mich App 27, 33, 36-37; 627 NW2d 5 (2001). Under the substantial truth doctrine, slight inaccuracies may not be sufficient to establish liability. *Hawkins v Mercy Health Servs, Inc*, 230 Mich App 315, 332-333; 583 NW2d 725 (1998). See also *Rouch v Enquirer & News of Battle Creek (After Remand)*, 440 Mich 238, 258; 487 NW2d 205 (1992) (explaining that defendants are not required to prove that the particular publication was "literally and absolutely accurate in every minute detail."). For example, this Court has explained "that [s]light inaccuracies of expression are immaterial provided that the defamatory charge is true in substance." *Collins*, 245 Mich App at 33 (citation and quotation omitted; alteration in original). The substantial truth doctrine considers "whether the evidence supports a finding that the 'sting' or 'gist' of the article would have a different effect upon the mind of the reader than would the literal truth. Under the test, minor differences are immaterial if the literal truth produces the same effect." *Koniak v Heritage Newspapers, Inc (On Remand)*, 198 Mich App 577, 580; 499 NW2d 346 (1993) (internal citation omitted).

Here, when viewed in context, no reasonable juror could conclude that the publication in the NPDB was false or that it portrayed Hanczaryk in a false light with regard to whether he performed the now-disputed procedure. Despite listing the procedure performed as "ADJUSTMENT OF CERVICAL SPINE ONLY," the report notes that the procedure was alleged to have occurred, that Hanczaryk contested his liability, that another employee other than Hanczaryk may have performed the disputed procedure, and that the case was settled, in large part, because of Chapin's mistakes. Notably, under a heading entitled, "Description of the Allegations and Injuries or Illness Upon Which the Action or Claim Was Based[,]" the report provided, in pertinent part:

> This professional liability lawsuit involved *allegations* from plaintiff that she incurred immediate pain and injuries leading to a herniated disc that either stemmed from a non-professional employee of insured's corporation placing her on a stretching machine or from *the one time alleged chiropractic adjustment* by the insured on the same date. There was some inconsistency between the medical records and billing records of [the] insured. The billing records charging for chiropractic adjustments and *his medical records indicating there were no adjustments performed. His deposition testimony described attempted adjustments but that he could not get the patient into position to adjust her due to significant pain level*.

> There were allegations by the plaintiff that the affidavit of meritorious defense was late filed. The trial judge ruled that as a result he would strike all expert testimony for trial other than that of [the] insured. This ruling was moved for reconsideration and was appealed to the Court of Appeals, but the experts

-10-

were not reinstated. . . .  It is believed by the defense attorneys that this Judge's original and subsequent rulings were in error and that he did not consider the facts presented for reconsideration.

In consideration of all of these difficulties, some of which were out of [the] insured's control, *he reluctantly agreed to consent to settle and the case was compromised and settled at mediation . . . .  No liability was proven and liability was denied by [the] insured.* [Emphasis added; capitalization altered.]

Hanczaryk and his personal attorney, David Patton, cooperated with defendants in drafting the report.  In addition to defendants' submission, Hanczaryk was given the opportunity, of which he took advantage, to submit a description of the settlement and pertinent events. Hanczaryk's submission essentially mirrored the submission by defendants in many instances, as the submission denied liability, cast blame on Chapin for his shortcomings, and noted that Hanczaryk filed a legal malpractice claim against Chapin.  In pertinent part, Hanczaryk's submission provided:

*[Hanczaryk] attempted to provide chiropractic treatment on a single occasion to the Plaintiff . . . .*  [Hanczaryk] fully performed the appropriate assessment, treatment, and advice-which chiropractic advice was refused by Plaintiff, as evidenced by her noncompliant behavior. . . .  Plaintiff presented to a neurosurgeon who performed surgery on Plaintiff for a medical condition that Plaintiff's attorney, in a Complaint filed more than one year later, *alleged was attributed to [Hanczaryk's] treatment* of Plaintiff.  Defense counsel retained two chiropractic experts to review the records and pleadings regarding [Hanczaryk's] treatment of Plaintiff.  *Both defense experts were supportive of [Hanczaryk's] treatment of Plaintiff, indicating that such chiropractic care complied with the requisite chiropractic standard of practice and such care did not cause or otherwise contribute to Plaintiff's claimed damages. . . .*  Defense counsel opined that the case was defensible and that there was no violation of the standard of practice and no causation as to the alleged damages.  Unfortunately, insurance-assigned defense counsel thereafter *committed miscue after miscue. . . .*  The substantively supportable defense of [Hanczaryk] [was] doomed by the cumulative sequence of defense counsels [sic] successive malaprops, miscues, errors, and his incurring the wrath of the Court, including the denial for defense Motions to Set Aside the Court Order Striking Experts and for Reconsideration. Not only was [Hanczaryk's] defense supported by two independent chiropractic experts but later two independent medical experts who were retained in spite of the Courts [sic] striking the defense experts, found the issues of causation and damage to be defensible and defense supportable.  However[,] for [Hanczaryk] it was too little too late and the action of insurance-assigned defense counsel doomed [Hanczaryk] and thus, [Hanczaryk] was constructively forced to consent to settle the within case—as the conduct of defense counsel had stripped the ability of [Hanczaryk] to embark upon, [sic] a successful defense for [Hanczaryk] . . . .  Further, it is noted that a legal malpractice claim has been filed regarding this matter . . . .  [Emphasis added.]

When viewed in context, the "sting" or "gist" of the NPDB submission was that the chiropractic procedure at issue in Boyer's malpractice action, as well as Hanczaryk's liability, were merely alleged and that Hanczaryk vehemently denied any liability in the action. Indeed, the report was substantially in conformity with Hanczaryk's own description, both contained in the report and in his trial testimony. Defendants' submission did not place Hanczaryk in a false light. As our Supreme Court has recognized, the law "has never required defendants to prove that a publication is literally and absolutely accurate in every minute detail." *Rouch (After Remand)*, 440 Mich at 258. Indeed, to support plaintiff's position would require focusing entirely on a single line, taking that line out of the context of the rest of the report, and would amount to a strained reading of the NPDB report. Such a "strained reading," taken out of context, does not amount to an actionable statement. See *Battaglieri*, 261 Mich App at 306. In summary, in light of the context of the report, no factual questions exist on which reasonable jurors could differ concerning the falsity of the report or whether the report placed Hanczaryk in a false light.[5] As such, we find that the trial court erred by denying defendants' motions for a directed verdict[6] and JNOV with regard to this issue. See *Aroma Wines & Equip*, 303 Mich App at 446; *Livonia Bldg Materials*, 276 Mich App at 517.

## B. NEGLIGENCE

Defendants argue that the trial court also erred in denying their motions for a directed verdict and JNOV with regard to plaintiffs' negligence claim. They contend that plaintiffs failed to establish that defendants violated any duties independent of defendants' contractual duties under the malpractice liability insurance policy. We agree.

"To establish a prima facie case of negligence, a plaintiff must prove four elements: (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) causation, and (4)

---

[5] To the extent plaintiffs argue that the mere filing of an NPDB report portrayed them in a false light leading to other fallout and a deterioration of Hanczaryk's reputation, they are conflating a cause of action under false-light invasion of privacy with damages resulting from defendants' alleged breach of contract for the manner in which they managed the underlying lawsuit against plaintiffs.

[6] Plaintiffs contend that defendants only challenged the element of publication in their motion for a directed verdict on the false-light claim. The record reveals otherwise. Defendants' motion for a directed verdict on the false-light invasion of privacy claim alleged that plaintiffs failed to establish any of the elements of the claim. The trial court questioned defense counsel regarding the publication element, and, after concluding that there was sufficient evidence to permit the jury to decide that element, the trial court denied defendants' motion without considering the remaining elements. We find that by challenging all of the elements at trial, defendants' argument regarding the substantial truth of the publication was arguably preserved in the directed verdict motion. However, regardless of whether defendants should have pursued a ruling on that element before the trial court, defendants are entitled to appellate relief because they established that they were entitled to JNOV on the false-light invasion of privacy claim, for the reasons stated above.

damages." *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000). "Whether a defendant owes a particular plaintiff a duty is a question of law that this Court reviews de novo." *Bailey v Schaaf*, 494 Mich 595, 603; 835 NW2d 413 (2013). "Only after finding that a duty exists may the factfinder determine whether, in light of the particular facts of the case, there was a breach of the duty." *Id.* (citation and quotation omitted).

Michigan does not recognize an independent tort for bad faith in the handling of an insurance claim. *Roberts v Auto-Owners Ins Co*, 422 Mich 594, 608; 374 NW2d 905 (1985). Moreover, where, as here, plaintiffs and defendants have a contractual relationship, in order to support a tort action, there must be some breach of duty that is distinct from a breach of the contract. *Rinaldo's Const Corp v Mich Bell Telephone Co*, 454 Mich 65, 83; 559 NW2d 647 (1997). "In other words, the threshold inquiry is whether the plaintiff alleges violation of a legal duty separate and distinct from the contractual obligation." *Id.* at 84. "We review de novo the determination whether a duty exists." *Hill v Sears, Roebuck & Co*, 492 Mich 651, 659; 822 NW2d 190 (2012).

We find that defendants were entitled to a directed verdict on plaintiff's negligence claim because no factual question existed regarding whether defendants owed plaintiffs any duties that were separate and distinct from the insurance contract. See *Rinaldo's Const Corp*, 454 Mich at 84; *Aroma Wines & Equip*, 303 Mich App at 446. At trial, plaintiffs primarily argued that defendants were negligent in the manner they performed their contractual duties to defend Hanczaryk and to act in good faith. Such duties were not separate and distinct from the insurance contract. See *Rinaldo's Const Corp*, 454 Mich at 84. In addition, plaintiffs argued at trial that defendants' disclosures in the NPDB report were negligent and that they placed Hanczaryk in a false light, and therefore were actionable. However, such an argument is merely an attempt to apply a lesser, incorrect standard to plaintiffs' false light claim. Moreover, even assuming the existence of such a duty, there could be no reasonable factual dispute regarding whether that duty was breached, given that the information in the report was substantially true.

On appeal, plaintiffs argue that defendants "had a common law duty, independent of the contract, to conduct their business affairs so as not to hurt others, like Plaintiff[s]." Plaintiffs make no effort to identify these duties or the harm that was caused by breaching the alleged duties. In opposing defendants' motion for a directed verdict before the trial court, plaintiffs advanced a theory that defendants violated a duty to warn Hanczaryk that his policy could be canceled and a duty to warn Hanczaryk that he would be removed from the Advisory Board. Any duty defendants had to warn Hanczaryk that his policy could be cancelled necessarily arose from the policy. Hanczaryk offers no evidence or legal argument to explain how defendants could have an obligation to warn him of the consequences of settling the Boyer litigation if that obligation did not arise from the parties' contractual relationship. Such an obligation "could not have existed but for a manifested intent [to contract]." Prosser & Keeton, Torts, § 92 at 656 (5 ed, 1984). Plaintiffs also do not explain how defendants had any non-contractual duty to warn Hanczaryk that settling the Boyer litigation could cause his removal from the Advisory Board. Accordingly, the trial court erred in denying defendants' motions for a directed verdict and JNOV with regard to Hanczaryk's claim for negligence.

-13-

## C. PROXIMATE CAUSE

Defendants argue that the trial court also erred in denying their motions for a directed verdict and JNOV on the dispositive issue of proximate cause with respect to all claims, because plaintiffs failed to establish with any reasonable certainty that defendants could have achieved a better outcome in the underlying litigation. Because, as discussed, we find that a directed verdict was appropriate on plaintiffs' tort claims, we only consider whether plaintiffs established causation with regard to their breach of contract claims.

Plaintiffs alleged that defendants' breach of contract caused economic damages. Defendants contend that the proximate cause of these injuries was Chapin's malpractice, which was a "fixed point" beyond defendants' control. Defendants argue that the evidence failed to establish with any reasonable certainty that the Boyer litigation would have resulted in more favorable outcomes if defendants had not committed the alleged acts or omissions giving rise to plaintiffs' claims.

"In a breach of contract case, the plaintiff must establish a causal link between the asserted breach of contract and the claimed damages." *Gorman v American Honda Motor Co, Inc*, 302 Mich App 113, 118-119; 839 NW2d 223 (2013). "There may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only." *Id.* (citation and quotation omitted). "To be adequate, a plaintiff's circumstantial proof must facilitate reasonable inferences of causation, not mere speculation." *Id.* (citation and quotation omitted).

We find that the issue of causation was properly submitted to the jury and that defendants were not entitled to a directed verdict or JNOV on this issue. The evidence established that plaintiffs' defense in the Boyer litigation was compromised by the trial court's order striking expert witnesses. A billing discrepancy also tended to corroborate Boyer's testimony on the central question of whether Hanczaryk performed a spinal adjustment. However, plaintiffs presented evidence suggesting that, even despite Chapin's malpractice, defendants' actions could have caused the economic damages. For instance, they presented evidence that defendants urged Hanczaryk to settle without requiring that Boyer's expert witnesses be deposed. They also presented testimony from Connie Houin, an expert in claims management, that defendants acted in bad faith because they failed to sufficiently manage and monitor the underlying malpractice claim and that they gave priority to their own interests over Hanczaryk's interest. She noted that one of Boyer's expert witnesses later changed his opinion after getting more information, but defendants failed to learn about this information because they took no efforts to defend the underlying lawsuit. In light of these conflicting facts, and drawing all inferences in favor of plaintiffs, we find that the trial court did not err by denying defendants' motion for a directed verdict or JNOV on the issue of proximate causation. See *Aroma Wines & Equip*, 303 Mich App at 446; *Livonia Bldg Materials*, 276 Mich App at 517-518.

## D. PLAINTIFFS' CLAIMS FOR NONECONOMIC DAMAGES

In light of the above, plaintiffs failed to establish any non-contractual theories for relief. "The recovery of damages for the breach of a contract is limited to those damages that are the natural result of the breach or those that are contemplated by the parties at the time the contract

-14-

was made." *Lane v KinderCare Learning Ctrs, Inc*, 231 Mich App 689, 692; 588 NW2d 715 (1998). Thus, there exists no theory to support the noneconomic damages in this case. Recognizing that noneconomic damages are generally not recoverable in claims for breach of contract, plaintiffs maintain that the insurance contract at issue was not merely a commercial transaction, but involved "matters of personal solicitude," namely the protection of Hanczaryk's career and reputation, which could be damaged by settlement of a non-meritorious claim. Although "it is generally held that damages for emotional distress cannot be recovered for the breach of a commercial contract," the Michigan Supreme Court "has recognized that damages for emotional distress may be recovered for the breach of a contract in cases that do not involve commercial or pecuniary contracts, but involve contracts of a personal nature." *Id.* at 693. In *Kewin v Massachusetts Mut Life Ins Co*, 409 Mich 401, 413-414; 295 NW2d 50 (1980), our Supreme Court addressed whether the plaintiff could recover noneconomic damages resulting from breach of a disability income protection insurance policy issued by the defendant. The plaintiff brought an action against the defendant insurer for bad-faith breach of the disability insurance contract. In addition to awarding the plaintiff damages for unpaid benefits, the jury awarded $75,000 for mental or emotional injury. *Id.* The Supreme Court addressed the *Stewart-Hadley* rule, derived from *Hadley v Baxendale*, 9 Exch 341; 156 Eng Rep 145 (1854), and *Stewart v Rudner*, 349 Mich 459; 84 NW2d 816 (1957), which allows an exception to the general rule precluding damages for mental distress in an action for breach of contract. Under the *Stewart-Hadley* rule, when the subject matter of a contract involves "matters of mental concern and solicitude," rather than "trade and commerce" or "pecuniary aggrandizement," mental and emotional pain and suffering "is a particularly likely result" of the breach. *Kewin*, 409 Mich at 416. "Flowing naturally from the breach, these injuries to the emotions are foreseeable and must be compensated despite the difficulty of monetary estimation." *Id.* The Court rejected the plaintiff's argument that the disability insurance contract involved matters of mental concern and solicitude, and reversed the award of emotional distress damages. *Id.* at 419. The Court explained the basis for its conclusion:

> Insurance contracts for disability income protection do not come within the reach of Stewart. Such contracts are commercial in nature; they are agreements to pay a sum of money upon the occurrence of a specified event, *Secor v Pioneer Foundry Co*, 20 Mich App 30, 35, 173 NW2d 780 (1969); 14 Michigan Law & Practice, Insurance, § 71, p 50. The damage suffered upon the breach of the agreement is capable of adequate compensation by reference to the terms of the contract. We recognize that breach of the insurance contract, as with almost any agreement, results in some annoyance and vexation. But recovery for those consequences is generally not allowed, absent evidence that they were within the contemplation of the parties at the time the contract was made. 22 Am Jur 2d, Damages, § 64, p 97. See, also, *Scottish Union & National Insurance Co v Bejcy*, 201 F2d 163, 166 (CA 6, 1953). [*Id.* at 416-417.]

In contrast, in *Lane*, 231 Mich App at 694, this Court held that a parent's contract with a child care provider was a matter of mental concern and solicitude, rather than pecuniary aggrandizement, and the parent was allowed to recover for emotional distress caused by improper care of the child.

In the case at bar, plaintiffs' insurance contract was undeniably a commercial transaction. The purpose of the insurance contract was to protect plaintiffs' business and personal assets in the event of a malpractice action by a patient. Although Hanczaryk perceived his career as much more than an economic asset, liability insurance is intended to protect assets, and it is not comparable to cases involving matters of personal solicitude. As such, we vacate and reverse the non-economic damages awarded to plaintiffs.[7]

## IV.  ATTORNEY MISCONDUCT

Defendants allege that plaintiffs' counsel engaged in several instances of misconduct that deprived defendants of a fair trial.  "An attorney's comments do not normally constitute grounds for reversal unless they reflect a deliberate attempt to deprive the opposing party of a fair and impartial proceeding." *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 302 Mich App 7, 21; 837 NW2d 686 (2013).  "Reversal is required only where the prejudicial statements reveal a deliberate attempt to inflame or otherwise prejudice the jury, or to deflect the jury's attention from the issues involved." *Id.* (citation and quotation marks omitted).  "Proper instructions to the jury will cure most, but not all, misconduct by counsel." *Moody v Home Owners Ins Co*, 304 Mich App 415, 446; 849 NW2d 31 (2014).  We note that defendants did not object to all of the alleged instances of misconduct at trial.  The failure to object to these comments does not preclude appellate review.  As we noted in *Moody*, 304 Mich App at 444, "incurable errors are not shielded from appellate review because an attorney fails to request what in that case would be a futile instruction."  (Citation and quotation marks omitted).

Defendants argue that plaintiffs' counsel appealed to the jury's prejudices and emotions, and distracted them from rationally reviewing the evidence.  They accuse plaintiffs' counsel of using inflammatory language, such as repeatedly using the terms "conspiracy" and "fraud," accusing witnesses of lying and committing perjury, and by characterizing defendants as an out-of-state corporation protecting its own interests while defaming Hanczaryk.  We find that the comments and arguments of plaintiffs' counsel, while at times inappropriate, were not so prejudicial as to require reversal.

### A.  ACCUSATIONS THAT DEFENSE WITNESSES LIED AND CONSPIRED

Plaintiffs' counsel accused a number of defense witnesses of lying, including telling Phillips, who was PACO and PICA's vice president of claims, that her testimony was "wrong," "just wrong."  Counsel also accused Daniel Shrode, a claims specialist, and Reeves, of lying, saying that they would "do anything" to "abort justice in this case[.]"  Further, plaintiffs' counsel accused Chapin, who testified in this action, that "he done took the stand and lied or he lied in all his correspondence.  What difference does it make?  A liar is a liar."  In closing argument, plaintiffs' counsel argued that several defense witnesses lied when they denied an intent to enforce a provision of Hanczaryk's insurance policy stating that defendants could deny coverage if Hanczaryk refused to cooperate or unreasonably withheld his consent to settle.  In addition,

---

[7] In light of this conclusion, we need not address the remainder of defendants' arguments related to the non-economic damages in this case.

plaintiffs' counsel repeatedly accused defense witnesses of conspiring together to protect defendants' interests over Hanczaryk's interests.

"Counsel may, acting on their own judgment as to propriety and good taste, discuss the character of witnesses, the probability of the truth of testimony given on the stand, and may, when there is any reasonable basis for it, characterize testimony." *Kern v St Luke's Hosp Ass'n of Saginaw*, 404 Mich 329, 353-354; 273 NW2d 75 (1978) (citation and quotation omitted). In *Badalamenti v William Beaumont Hospital-Troy*, 237 Mich App 278, 290; 602 NW2d 854 (1999), this Court reversed a judgment for the plaintiff where the plaintiff's "lead trial counsel completely tainted the proceedings by his misconduct." The attorney "repeatedly and with no basis in fact accused defendants and their witnesses of engaging in conspiracy, collusion, and perjury to cover up their alleged malpractice." Counsel's "main theme" was that the defendants fabricated the defense that a rare drug reaction, rather than the defendant's malpractice, caused the plaintiff's injuries. *Id.* Additionally, counsel "insinuated, relentlessly, outrageously, and with no supporting evidence," that a physician and nurse engaged in a sexual tryst while the plaintiff lay neglected in the hospital unit. *Id.* The lead trial counsel repeatedly argued that the defendants were primarily motivated by greed in their negligent care of the plaintiff and their attempts to cover up mistakes. Counsel linked these concepts with references to the defendants' corporate power and resources to hire a "dream team" of attorneys to raise numerous "preposterous" defenses. Counsel "appealed to the jurors' self-interest as taxpayers" by arguing that the defendant, and not the taxpayers, should pay for rehabilitation services that the plaintiff received from a state-funded agency. *Id.* at 291.

In the instant case, plaintiffs' counsel's accusations of dishonesty and conspiracy may have been objectionable, but they did not cross the line as occurred in *Badalamenti*. Plaintiffs' counsel did not impugn any wild accusations comparable to the sexual tryst accusation in *Badalamenti*. Plaintiffs' comments about the witnesses' alleged dishonesty were based on the purported contradictions between their testimony and the written correspondence, so the jury had the opportunity to make its own comparison between the correspondence and testimony. Moreover, the central issue in this case was whether defendants made good-faith efforts to act in plaintiffs' best interests, or whether it gave priority to their own interests. These circumstances by themselves implied that each of the adversaries wanted the jury to believe that their representatives were truthful and the opposing side's untruthful. Plaintiffs' counsel's direct accusation was no more than an explicit statement of what was already implied.

Further, we find that plaintiffs' counsel's frequent interjection of the words "conspiracy" and "fraud" did not deprive defendants of a fair trial. Plaintiffs' trial theory was that defendants' agents combined to protect their own interests after Chapin's mistakes compromised plaintiff's defense. Plaintiffs presented evidence that Reeves, Shrode, Phillips, Chapin, and others exchanged e-mails and conferred on how to minimize the damage to defendants. According to plaintiffs, their plans were detrimental to plaintiffs, giving Hanczaryk little choice but to accept a settlement offer contrary to his convictions that Boyer's lawsuit was a sham. In view of this evidence and plaintiffs' theory of the case, referring to defendants' conduct as a conspiracy was not wholly unjustified. The term was hyperbolic, but it does not seem calculated to inflame jurors so that they would return a verdict based on outrage rather than on evidence.

## B. EMPHASIZING THE CORPORATE STATUS OF THE INSURANCE COMPANIES

Next, defendants argue that plaintiffs' counsel committed misconduct by arguing that PACO and PICA were ruthless out-of-state corporate defendants with no regard for Hanczaryk. Defendants compare this case to *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 776; 685 NW2d 391 (2004), in which the plaintiff's lead counsel persistently made "hyperbolic and vitriolic argument[s]" that were described as "[o]verreaching, prejudice-baiting rhetoric[.]" In that case, the plaintiff's attorney argued that the defendant's treatment of the plaintiff was analogous to the Nazis' treatment of the Jews, and his analogy referenced the shared German ethnicity between the Nazis and the defendant's ownership. *Id.* at 771-772.

In the case at bar, plaintiffs' counsel's references to defendants' status as an out-of-state corporation lacked the overwrought drama of the attorney's arguments in *Gilbert*, 470 Mich at 771-772. Plaintiffs' statements that defendants were a "ruthless company" in which no one "care[d] anything about little Dr. Hanczaryk," did not include the same degree of inflammatory rhetoric that the plaintiff's counsel resorted to in *Gilbert*. Plaintiffs' argument invoked contrasting stereotypes of Hanczaryk as a physician motivated to help his patients, and defendants as a greed-motivated impersonal entity. In contrast, counsel in *Gilbert* compared the defendant to a genocidal, totalitarian regime, emphasized the shared ethnicity between the defendant and the Nazis, and falsely portrayed the plaintiff as a victim of intensive physical abuse. The subtext of the attorney's histrionic speech in *Gilbert* was that the jurors were morally superior working-class Americans with an opportunity and duty to punish the amoral German corporate behemoth. The subtext of plaintiffs' argument in the instant case was less insidious. And, we note that the trial court instructed the jury that it was not to treat the corporate defendants differently because of their corporate status. In light of this instruction, we find that counsel's comments were not so inflammatory as to prejudice the jury and deprive defendants of a fair trial. See *Moody*, 304 Mich App at 446 ("Proper instructions to the jury will cure most, but not all, misconduct by counsel.").

## C. MISCHARACTERIZING EVIDENCE

Defendants argue that plaintiffs' counsel committed misconduct by mischaracterizing witness testimony in the following regards: (1) mischaracterizing that Phillips admitted the mistake in the NPDB entry constituted negligence; (2) mischaracterizing that Hanczaryk was removed from the Advisory Board after the settlement; and (3) mischaracterizing that defendants knew and concealed from Hanczaryk that his insurance policy would be cancelled if he settled the case. With regard to the first and third alleged errors, we find that plaintiffs' counsel attempted to characterize testimony offered at trial, and did not deliberately misstate the evidence that had been presented. See *Kern*, 404 Mich at 353-354 (citation and quotation omitted) (explaining that counsel, "[w]hen there is any reasonable basis for it, [may] characterize testimony."). Concerning the second alleged error—that counsel mischaracterized testimony that Hanczaryk was removed from the Advisory Board after the settlement—we find that plaintiffs' counsel misstated the evidence. Indeed, Hanczaryk admitted that literature distributed *before* his settlement noted that he was in "alumni status" on the Advisory Board. Thus, counsel's statement that "[t]hey didn't tell him they were gonna kick him off the National Board; they kept that a secret" was not supported by the evidence. However, given Hanczaryk's own admission that this was not true likely eliminated any confusion on this point. Further, the trial court

instructed the jury that the attorneys' arguments were not evidence, and "[p]roper instructions to the jury will cure most, but not all, misconduct by counsel." *Moody*, 304 Mich App at 446. We do not find that this remark was "so improper that [it] might have denied [defendants] a fair trial." See *id.* at 444.

## V.  POLYGRAPH RESULTS

Next, defendants argue that the trial court erred by denying their motion for a new trial based on the introduction of polygraph evidence at trial. We review for an abuse of discretion the trial court's decision on a motion for a new trial. *Zaremba Equip*, 302 Mich App at 21. "An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes." *Id.*

The record reveals that before trial, the trial court ruled that the results of polygraph tests taken by Hanczaryk and Boyer in relation to the underlying medical malpractice suit were inadmissible. However, the trial court ruled that the parties could introduce evidence of an offer submitted by Boyer's attorney that if Hanczaryk passed a polygraph and Boyer did not, Boyer would dismiss the case; alternatively, if Boyer passed and Hanczaryk did not, Boyer's attorney offered to settle the case for the policy limit of $500,000. The record reveals that defendants communicated this offer to Hanczaryk, but recommended that he not take a polygraph test. At trial, both parties made several references to the polygraph tests, including the results of Boyer and Hanczaryk's polygraph tests. First, during cross-examination of Hanczaryk, defense counsel asked whether Paul Manion, who was eventually brought on as co-counsel in the underlying medical malpractice suit, advised Hanczaryk of reasons to settle the underlying suit. After Hanczaryk answered in the affirmative, defense counsel asked if those reasons included "a lie detector[.]" Hanczaryk answered in the affirmative. Thereafter, both parties continued to mention polygraph tests and the results of those tests, with plaintiffs' counsel expressly injecting the results of Hanczaryk's test into evidence and argument on multiple occasions, and defense counsel expressly questioning witnesses about the results of Boyer's polygraph test on two occasions.[8] Defendants now contend that plaintiffs' references to Hanczaryk's polygraph results denied them a fair trial.

"Michigan decisions have uniformly held against admissibility of the polygraph," at both civil and criminal trials. *People v Barbara*, 400 Mich 352, 364; 255 NW2d 171 (1977). Here, although plaintiffs improperly injected the results of Hanczaryk's polygraph at trial, we find that defendants cannot be heard to complain about as much, given that they opened the door to such evidence. See *Lewis*, 258 Mich App at 210; *Hilgendorf v St John Hosp & Med Center Corp*, 245 Mich App 670, 704 n 47; 630 NW2d 356 (2001). Indeed, it was defendants who first injected the results of polygraph tests into evidence by asking Hanczaryk whether a "lie detector" was one of the reasons why Manion suggested he settle the case against him. Although such a question did not directly reference the results of either Boyer or Hanczaryk's polygraph, the logical inference from such a question was that the results of a polygraph were unfavorable to

---

[8] Apparently, both Boyer and Hanczaryk took and "passed" their respective polygraph tests at some point.

Hanczaryk, either because it showed that Boyer performed favorably on a polygraph test or that Hanczaryk had not performed favorably. Accordingly, because defendants first introduced this evidence, we find that their claim for relief on this ground is meritless. See *Lewis*, 258 Mich App at 210 (explaining that error requiring reversal cannot be error "to which the aggrieved party contributed by plan or negligence.").

## VI. PRIVILEGED DOCUMENTS

Defendants argue that certain documents admitted at trial were protected by attorney-client privilege and that the trial court abused its discretion by admitting the documents. They argue that the trial court abused its discretion by declining to grant their motion for a new trial because of the admission of those documents. Assuming, without deciding, that the documents were admitted in error, defendants are not entitled to relief on this ground because witnesses gave testimony that was similar to the contents of the documents, without objection from defendants, and defendants do not now challenge the admissibility of the witnesses' testimony. The specific written communications introduced into evidence as exhibits did not materially add to the facts introduced through the witnesses' testimony. Because the evidence was cumulative to properly admitted evidence, defendants are not entitled to a new trial. MCR 2.613(A)("An error in the admission . . . of evidence . . . is not ground for granting a new trial . . . unless refusal to take this action appears to the court inconsistent with substantial justice.")

## VII. DOUBLE RECOVERY

Lastly, defendants argue that the $112,500 settlement paid to Bristol Chiropractic should be offset against the $408,218 that the jury awarded Bristol Chiropractic on its breach of contract claims. Defendants allege that the damages alleged against them and those alleged against Chapin and Garan Lucow were the same, and that failing to offset the settlement against the jury verdict permits plaintiffs a double recovery. The trial court denied their request. We review this issue de novo. *Grace v Grace*, 253 Mich App 357, 368; 655 NW2d 595 (2002).

"Generally, under Michigan law, only one recovery is allowed for an injury." *Id.* See also *Greer v Advantage Health*, 305 Mich App 192, 208; 852 NW2d 198 (2014). "Thus, where a recovery is obtained for any injury identical with another in nature, time, and place, that recovery must be deducted from the plaintiff's other award." *Grace*, 253 Mich App at 369. This includes instances where a plaintiff obtains a judgment or settlement for a tort claim as well as a judgment for breach of contract where the damages awarded amount to a double recovery. *Great Northern Packaging, Inc v Gen Tire & Rubber Co*, 154 Mich App 777, 783; 399 NW2d 408 (1986). "To ascertain whether a double recovery has occurred, we must determine what injury is sought to be compensated. In making such a determination, the nature of the conduct causing the injury and the label attached to the plaintiff's claims are of little relevance." *Chicilo v Marshall*, 185 Mich App 68, 70; 460 NW2d 231 (1990). In making this determination, we are to look "beyond the theoretical damages and look at the actual damages sought and proved by plaintiff[s] in the case at bar to determine the extent of the overlap of damages, if any." *Great Northern Packaging*, 154 Mich App at 785.

Plaintiffs could have pursued different damages against different defendants, given that they alleged tort claims against Chapin and Garan Lucow and contract claims against defendants.

However, plaintiffs' second amended complaint reveals that they sought the *exact same damages* against Chapin and Garan Lucow as they did against defendants on the breach of contract and bad faith claims. "Accordingly, under the facts of this case . . . there was a complete setoff as plaintiff[s] *sought the same damages on all claims*." *Great Northern Packaging*, 154 Mich App at 786 (emphasis added). As such, the trial court erred by refusing to offset Bristol Chiropractic's damages in this case. On remand, the trial court should offset the jury verdict in favor of Bristol Chiropractic on the breach of contract claims by the amount awarded to Bristol Chiropractic in its settlement with Chapin and Garan Lucow.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.


/s/ Cynthia Diane Stephens
/s/ Michael J. Talbot
/s/ Jane M. Beckering